# CONTINUATION OF
# APPLICATION FOR A SEARCH WARRANT

I, Special Agent Joshua George, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this Continuation in support of an application for a search warrant authorizing the collection of a Deoxyribonucleic Acid ("DNA") sample for Fernando Alejandro LOPEZ AKA Alex GARLOCK ("LOPEZ") more fully described in Attachment A, by collecting oral (buccal) swab samples according to the standard practices and procedures employed by the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") for DNA testing as described in Attachment B. This Continuation is made in support of an application for a search warrant under Federal Rule of Criminal Procedure 41. Based on the information set forth below, there is probable cause to believe that the crime of Theft of Firearm from FFL Inventory of 18 U.S.C. § 922(u), took place on or about May 27, 2024, in Muskegon County, Michigan. There is probable cause to believe that DNA gathered via buccal swab will provide additional evidence as to the commission of this crime.

1. I have been employed as a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives since July of 2023. I am currently assigned to the Detroit, Michigan Field Division, Grand Rapids Field Office, where I am tasked with investigating violations of firearms and narcotics laws. Before working for the ATF, I was a certified Police Officer in the State of Tennessee for six years. During my career in law enforcement, I have been involved in numerous investigations related to violations of federal criminal statutes, including those involving violations related to narcotics and firearms.

2. The statements in this Continuation come from my personal observations, my training and experience, my review of relevant records related to this investigation, and information obtained from other agents and witnesses. This Continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

3. Based on my training and experience and the facts set forth in this continuation, there is probable cause to believe the requested DNA samples will yield evidence that the LOPEZ engaged in the aforementioned federal crime.

**Probable Cause**

4. On May 27, 2024, Muskegon Township Police Department responded to a burglary alarm at Genie's Northside Outlet at approximately 23:16. "Genie's Northside Outlet" is a pawn shop located at 1420 Holton Road Muskegon, MI 49445 that sells firearms. Police observed the front door had been broken. Shattered glass was located on the ground outside of the business and the bottom of the door frame was bent.

5. Police conducted a canvas of the property and found that inside the business there was a shattered glass case. The owner was notified. The owner assisted law enforcement in obtaining video from the incident. Police reviewed video and video shows a red four door SUV arriving at the business. Three masked individuals force entry into the building by throwing a stone at the glass then kicking the glass. The three masked individuals were wearing blue nylon gloves. The three masked individuals were in and out of the store within minutes. The three individuals entered back into the red SUV and left the area. Through the course of the investigation, it was found that nine firearms had been stolen. Police located a piece of blue nylon glove on scene. The nylon glove was submitted to the lab for DNA.

6. On May 28, 2024, Muskegon Police Department received a call for a stolen vehicle from a car dealership of a 2017 red Kia Sportage. Officers were advised by Muskegon Township Police Department that video of the burglary that took place at Genie's Northside Outlets showed a red SUV was used by the suspects. This matches the description of a red Kia Sportage. The dealership manager was able to ping the vehicle to Arbor Crossing Apartments located at 834 S. Sheridan Dr. Muskegon, Michigan 49442. Police searched the vehicle and found multiple latex gloves discarded throughout the vehicle. They also found a tag for a Walther 22 pistol that appeared to be ripped from a string. One of the firearms stolen from Genie's Northside Outlet was a Walther p22 pistol Serial Number**: WA4B3097.** Police sent the vehicle to the Michigan State Police lab for fingerprinting and DNA.

7. On June 9, 2024, St. Louis Police Department officers observed a Chrysler 300 with a broken taillight pull into a parking lot and shut its headlights off. The vehicle then pulled out of the parking lot back onto the street, and the headlights came back on. Police initiated a traffic stop at a Sunoco EZ Mart on Washington Avenue and Main Street for the broken taillight. Alma Police Department responded to a traffic stop to assist St. Louis Police. Police made contact with the driver of the vehicle, a minor, J.M. J.M. advised police he just picked up the two passengers in the vehicle: LOPEZ, sitting in the front passenger seat and Clifford Mallory, sitting on the driver's side rear passenger seat.

8. Police asked J.M. for his driver's license. J.M. advised he was sixteen years old and did not have a driver's license. The officer then asked LOPEZ for his driver's license. LOPEZ advised his license was suspended. Mallory advised the officer he also did not have a driver's license. After this exchange, police asked J.M. to step out of the vehicle. J.M. was asked if the

vehicle had insurance on it. J.M. stated the vehicle did not have insurance. J.M. also advised he had just recently met LOPEZ and Mallory.

9.      Police verified that driver of the vehicle and the two passengers did not have a valid driver's license. Police also confirmed that the vehicle did not have insurance on it. Based on these facts police asked LOPEZ and Mallory to step out of the vehicle. While LOPEZ was stepping out of the vehicle, he asked if he could bring his backpack that was at the floor of where he was sitting. Police told him to leave the backpack in the vehicle.  Police asked J.M. for consent to search the vehicle. J.M. denied police consent. Police advised the vehicle would be towed, and that an inventory search must be performed prior to towing the vehicle.

10.     Police proceeded to conduct an inventory search of the vehicle. Upon searching the vehicle police found a loaded 9mm Ruger handgun with a live round in the chamber. The Ruger was located in the rear portion of the driver's seat pouch. The location of the pistol would have been within arm's reach of Mallory since he was sitting in the driver's side rear passenger seat of the vehicle. Police also searched the backpack that was on the floor of the front passenger side of the vehicle. This was the backpack LOPEZ asked police to bring outside of the vehicle. Upon searching the backpack, police found a small baggie containing twenty pills, suspected narcotics. There was also a scale with a white powdery substance on it consistent with drug paraphernalia found in the backpack.

11.     Alma police stood by with the three occupants of the vehicle, while St. Louis police conducted an inventory search of the vehicle. The Alma police officer noticed that LOPEZ had a head and face covering tucked under his chin. The officer also observed a bulge from the contents in LOPEZ's front pocket, and his hoodie pocket weighed down from an unknown object. Alma

police observed bags of suspected narcotics being placed on the roof of the vehicle as St. Louis police conducted the inventory search.

12. Alma police were then notified a pistol was found in the vehicle. Based on these facts Alama police attempted to conduct a pat down of the object weighing down LOPEZ's hoodie pocket. LOPEZ resisted police and attempted to pull away from the officer. Police placed LOPEZ in handcuffs and searched his hoodie pocket. Police found a Charter Arms Blue Diamond Revolver Serial Number: 24L01925 in LOPEZ's hoodie pocket. This is one of the firearms stolen from Genie's Northside Outlet on May 27, 2024. Police searched the rest of LOPEZ's person and found another head and face covering and cash in his front pocket. LOPEZ was secured in a patrol vehicle. The Alma officer went back to the area LOPEZ was searched and found a plastic baggie containing a white powdery substance, consistent with narcotics.

13. LOPEZ has an address in Muskegon, as laid out in Attachment A; his address is in Muskegon County in the Western District of Michigan.

14. Investigators will compare DNA of LOPEZ obtained under the authority of this search warrant to any DNA collected from inside the recovered Kia Sportage, on the firearm recovered from LOPEZ's pocket, and from the blue glove found on scene to the burglary that occurred at Genie's Northside Outlet.

### DNA TESTING AND THE COLLECTION OF DNA SAMPLES

15. Based on my training and experience, including discussions with other law enforcement officers, I know that there are two sources of DNA used in forensic analyses. Nuclear DNA (nDNA) is typically analyzed in evidence containing blood, saliva, body tissue, and hairs that have tissue at their ends. Mitochondrial DNA (mDNA) is typically analyzed in evidence containing naturally shed hairs and hair fragments. When DNA evidence is transferred by direct

or secondary (indirect) means, it remains on surfaces by absorption or adherence. In general, liquid biological evidence is absorbed into surfaces and solid biological evidence adheres to an object. Current DNA tests are so sensitive that they can type the DNA found in samples containing only a few cells. Merely touching an object may leave enough DNA material that a forensic analysis will be able to match the object to the person who touched it.

16. Buccal swabs provide the least invasive way to conduct DNA testing. A buccal swab is a cotton-tipped applicator that will be used to collect cheek cells from inside a person's mouth. The lab will then extract a person's DNA profile from the buccal swab, which will then be used for comparison purposes to the profile(s), if any, ultimately extracted from swabs collected from other evidence.

17. I propose to take the DNA samples sought herein in an entirely non-intrusive manner. Specifically, I seek to take "buccal," or cheek, swabs from the inside of the mouth of LOPEZ by using cotton-tipped applicators (similar to a Q-tip) to rub the inside of the cheek of LOPEZ. The buccal swabs take moments, involve no risk to health, "no risk, trauma, or pain," and may be conducted at the Gratiot County Jail or in any other secure location.

18. I have been informed by the United States Attorney's Office that it is well settled that the Fifth Amendment privilege against self-incrimination does not preclude the use of one's body as evidence. *Schmerber v. California*, 384 U.S. 757, 765 (1985); *Wilson v. Collins*, 517 F.3d 421, 431 (6th Cir. 2008); *Mcveigh v. Smith*, 872 F.2d 725, 727-28 (6th Cir. 1989). I have also been informed that procedures such as these do not implicate the Sixth Amendment. *See, e.g., McVeigh*, 872 F.2d at 727.

19. Investigators will compare the DNA of LOPEZ obtained under the authority of this search warrant to any DNA obtained collected from the recovered from the blue glove recovered

at Genie's Northside Outlet recovered on or about May 27, 2024, and from inside the Kia Sportage recovered on or about May 28, 2024.

## **CONCLUSION**

I submit that there is probable cause to issue the requested warrant. Based on these facts, I have probable cause to believe that a violation of 18 U.S.C. § 922(u), Theft of Firearm from FFL Inventory, occurred on or about May 27, 2024, and a DNA sample from LOPEZ will yield evidence of their involvement of that offense.